## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DEADRIA FARMER-PAELLMANN** : | |
| **15 West 12th Street, 6G** : | |
| **New York, NY 10011,** : | |
| : | |
| **and** : | |
| : | |
| **RESTITUTION STUDY GROUP, INC.** : | |
| **15 West 12th Street, 6G** : | |
| **New York, NY 10011,** : | |
| : | |
| **on behalf of themselves and all others** : | **Civil Case No. 1:22-cv-3048** |
| **similarly situated,** : | |
| : | |
| **Plaintiffs,** : | |
| **v.** : | |
| : | |
| **SMITHSONIAN INSTITUTION** : | |
| **Office of General Counsel** : | |
| **1000 Jefferson Drive, Room 302** : | |
| **Washington, DC 20560** : | |
| : | |
| **Defendant.** : | |

## COMPLAINT

For their Complaint, by and through counsel, Plaintiffs allege as follows:

### I.       SUMMARY OF ACTION

1.       This is a class action complaint alleging an anticipatory breach of trust. Plaintiffs

seek exclusively equitable relief that includes, among other things, a preliminary and permanent

injunction to prevent Defendant Smithsonian Institution from effecting its gifting to the Federal

Republic of Nigeria's National Commission for Museums and Monuments ("NCMM") of 29 of

39 Benin Bronzes, which have an approximate value in excess of $200 million, that the

Smithsonian Institution owns and possesses as trustee for the People of the United States.

2.      The Smithsonian Institution is not only a trust instrumentality for all people of the United States, but it is or should be a common law trust for the thousands of citizens of the United States who are descended from West African peoples who lived in what is now called Nigeria, and whose lives and liberty were destroyed by the greed of royal Beni[1] traffickers, European slave traders, and European agriculturalists in North America.

A.      The BENIN BRONZES ARE NOT MERELY CULTURAL OBJECTS

3.      The Benin Bronzes are not simply valuable *objets d'art*: they have a unique and special historical relationship to descendants of enslaved African-Americans whom Europeans forcibly brought to North America. Many, but not all, of these objects were crafted from metal ingots, melted down from a currency called manillas, that European slave traders paid to the oba (the Beni term for king) of the Kingdom of Benin, or to members of the Benin nobility, in exchange for abducted and enslaved neighboring non-Beni people.

4.      The cultural importance of the Benin Bronzes to citizens of the United States who are descendants of enslaved Africans from Western Africa who were abductees of royal Benin traffickers (specifically, from parts of what is now the Federal Republic of Nigeria, including the Benin river, Aghway, Lagos, Onim, Oere, and Rio Forcados) cannot be monetized. They offer a rare opportunity for all Americans to engage with the actual currency that caused people to be kidnapped and separated them from their homelands, families, languages, and religions.

5.      After buying abducted enslaved people from royal Beni traffickers, the European slave traders (primarily Portuguese, Dutch, French, and English slavers) forcibly transported

---

[1] "Benin" refers to the Kingdom of Benin; "Beni" refers to the people who populated the Kingdom of Benin.

them to Brazil, the Caribbean, mainland North America, and Europe to work for, and be subjected, to the wealth-building needs of plantation owners. Meanwhile, the royal Beni traffickers had craftsmen transform these copper-based ingots into what are now called the Benin Bronzes.

### B.    The DISPERSAL OF THE BENIN BRONZES

6.    During a raid in early 1897 on Benin City, the British seized over 10,000 of what became known as the Benin Bronzes. The stolen Benin Bronzes were dispersed throughout the world and are scattered in 160 museums and private collections. The Smithsonian holds thirty-nine of them.

### C.    DEFENDANT'S IMPENDING ACTION AND ITS BRACKETED STORY

7.    On June 13, 2022, Defendant Smithsonian Institution's Board of Regents resolved to deaccession and transfer 29 of its 39 Benin Bronzes to the control of descendants of Beni royalty, whose ancestors were never enslaved but who kidnapped, enslaved, and trafficked other peoples to European slave-traders in exchange for the bronze and brass from which the Benin Bronzes were made.

8.    In undertaking this purported "ethical" action of returning stolen property to its "rightful" owners — the descendants of the royal Beni traffickers — Defendant has expediently bracketed the story of the Benin Bronzes to have begun in 1897 and to end happily with transfer to Nigerian Africans on October 11, 2022.

### D.    DEFENDANTS DISREGARD THE COMPLETE STORY

9.    Defendant knows that its bracketed story of the Benin Bronzes is an incomplete "undoing" of European colonialists' and slavers' wrongs against Africans from the area now called Nigeria in the late 19th century: the Board of Regents knows or should know that the

3

bigger theft was by European slave traders and royal Beni traffickers who stole thousands of people's lives and liberty so that Europeans could enhance agricultural profits without having to pay for labor and so royal Beni traffickers could obtain copper-based metal that they would fashion into iconic sculptures.

10.     Only by means of this first and much more important theft—abductions and sales of innocent people and the loss of their liberty and lives—could this wealth in metallic sculptures have been acquired for later theft by the British. This story actually began in the early 16th century and it has yet to end. It cannot be "undone" or ended by the expedient of returning to the traffickers the payments they received in exchange for sacrificing the lives of the ancestors of African-Americans of Nigerian descent.

11.     Defendant's planned action assumes that Africans have a single and unified interest, but American Africans who originated in Western Africa have no interest in returning the payment that Beni royalty received from European slave-traders for having jointly trafficked them.

12.     The Government of the United States has thwarted efforts to make any reparations to descendants of African enslaved people whose lives, liberty, and labor created immense wealth for certain elites in the United States. Return of the payments made for the lives, liberty, and labor of these abducted and enslaved people to the traffickers is the opposite of reparation: it is effectively a "thank you."

## II.     PARTIES

### A.     DEFENDANT

13.     **Smithsonian Institution**. The Smithsonian Institution is a non-profit entity created in 1846. Congress and President James Polk passed an Act to Establish Smithsonian

Institution (9 Stat. 102) as a trust instrumentality of the United States ("Act of Establishment"), organized in the District of Columbia and created to hold in trust the assets of the British chemist and minerologist, James Smithson who bequeathed them to the United States "for the increase and diffusion of knowledge among men."

14.    The Act of Establisment assigned the Smithsonian Institution various roles and functions, including the roles of museum, observatory, library, laboratory, and depository for copyrights.

15.    As a trust, the Board of Regents and the Secretary administer the Smithsonian Institution. On the June 10, 1857, the *Opinion of Attorney General* [Judge Jeremiah S. Black] *on National Museum* determined that the Smithsonian Institution was the National Museum and as such could receive appropriations from the national government to care for National Collections. Annual appropriations beginning in 1858.

B.    PLAINTIFFS

16.    **Deadria Farmer-Paellman.**  Plaintiff Deadria Farmer-Paellmann, J.D., M.A. ("Farmer-Paellmann"), is a citizen and resident of the United States, domiciled in the State of New York, and is of Nigerian descent. Specifically, she descends in part from peoples located within the sphere of influence of the Kingdom of Benin, in Lagos and near Warri, the ports from which many people captured by the Beni were transshipped to the United States. She founded and incorporated Restitution Study Group, Inc. Her ancestors are likely abductees of royal Beni traffickers who sold them to European slave traders and who, as a result, were transported to and disembarked at communities near Charleston, South Carolina, the main port where Beni-trafficked enslaved people disembarked to be further sold into bondage.

17.    **Restitution Study Group, Inc.**  Plaintiff Restitution Study Group, Inc. ("RSG")

is a New York non-profit corporation that Deadria Farmer-Paellmann founded on May 8, 2003,

and is a tax-exempt corporation under the Internal Revenue Code, 26 U.S.C. 501(c)(3).  Its

purpose is to promote slavery justice, and its Web site is www.rsgincorp.org.

18.     RSG was formed to "examine and execute innovative approaches to healing the

injuries of exploited and oppressed people." It represents heirs to the treasures of the Benin

Bronzes who are DNA descendants of enslaved people who financed the making of the relics

with their lives and "partners with community advocates to bring about positive change through

litigation, legislation, genealogy and DNA research, and direct action." RSG's Web site states:

> One of our primary efforts has been to secure reparations and restitution from
> corporations complicit in the antebellum enslavement of Africans. Our goal is to
> create a Community Trust Fund managed by Black business and community
> leaders to invest in efforts to repair the economic, educational, and health
> disparities from which descendants of enslaved Africans suffer.

19.     **Class of DNA Descendants**. The proposed class includes all African-Americans

who are citizens of the United States and whose ancestors were also residents of what is now

called Nigeria whom royal Beni traffickers kidnapped and sold to European slave traders.

Research shows that over 90% of United States citizens who are descendants of African enslaved

people in the United States can trace their ancestry to one of four Atlantic African populations,

with the area that now forms the Repulic of Nigeria being the most common.

C.     OTHER RELEVANT PERSONS

20.     **Board of Regents**.  Congress established a Board of Regents to administer the

Smithsonian Institution, and its members include the Chief Justice of the United States, the Vice

President of the United States, three members of the United States Senate, three members of the

United States House of Representatives, and nine citizens. The Board of Regents meets at least

four times each year and typically convenes in the Regents Room.

6

21.    **Director of the National Museum of African Art**.  The Smithsonian Institution displayed the Benin Bronzes in the National Museum of African Art, which Warren M. Robbins (1923-2008) founded in 1964 as the Museum of African Art ("MAfA"). Robbins wanted MAfA to be a private educational organization for providing "a foundation for interracial understanding," and later lobbied Congress to incorporate `it into the Smithsonian Institution; in 1979, the MafA became part of the Smithsonian Institution, and 1981, the Smithsonian Institution renamed it the *National* Museum of African Art ("NMAA").  Ngaire Blankenberg is the Director of the NMAA.

III.    **JURISDICTION AND VENUE**

A.    JURISDICTION

22.    This Court has jurisdiction of this action under 28 U.S.C. § 1331, because it involves a federal question and the Defendant is an instrument or component of the United States Government.

23.    This Court also has jurisdiction of this action under 28 U.S.C. § 1332, because Plaintiffs Farmer-Paellmann and RSG are domiciled in the State of New York and Defendant Smithsonian Institution is domiciled in the District of Columbia.

24.    The judicial doctrine of sovereign immunity does not block the Court's jurisdiction because Plaintiffs are seeking exclusively equitable, non-monetary relief.

25.    This Court also has jurisdiction of this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). In this action: (1) the proposed class includes 100 or more members, namely, African-Americans of Nigerian descent; (2) the members of the proposed class include some who do not live in this district and have citizenship different from Defendant's citizenship; and (3) the claims of the proposed class members involve assets, namely, the Benin Bronzes, that

7

exceed $5 million in aggregate value.

26.     This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over

Plaintiffs because the claims of this class derive from a common nucleus of operative fact.

27.     This Court has personal jurisdiction over Defendant because it is domiciled in the

District of Columbia, the Benin Bronzes are located in the District of Columbia, and many or all

of the relevant actions and anticipated actions complained of herein and giving rise to the claims

alleged herein have occurred and, unless prevented, will occur in this District.

**B.     VENUE**

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a

substantial part of the events giving rise to the claims occurred in the District of Columbia.

**IV.     STANDING OF PLAINTIFFS**

29.     Defendant Smithsonian Institution holds the Benin Bronzes in the National

Collection, which is the trust corpus, as: (1) the Trustee for the People of the United States, not

only the Government of the United States, and (2) the Trustee of a special common law trust of

the United States for United States citizens descended from that portion of Western Africa now

called Nigeria whose ancestors the Kingdom of Benin abducted and sold—for the metals

contained in Benin Bronzes produced from the 16th to 19th centuries—into Anglo-American

slavery.

30.     Plaintiffs have personal stakes in the outcome of this action insofar as the metal of

which the Benin Bronzes are made *are* and *represent* monetary or in-kind metallic value that

European slavers used to pay royal Beni traffickers for the lives and liberties of Plaintiffs'

enslaved ancestors.

31.     Defendant's planned relinquishment of the Benin Bronzes to the descendants of

those who were essential in the trafficking of Plaintiff Farmer-Paellmann's and the Class's ancestors would cause yet another moral and economic injury to Plaintiffs that can be prevented only if the equitable relief sought herein is granted.

**V.      PLAINTIFFS' EXHAUSTION OF ADMINISTRATIVE REMEDIES**

32.     After learning on March 8, 2022, of Defendant's intention to deaccession and transfer the Benin Bronzes, particularly those fabricated during the 16th to 19th centuries when the transatlantic slave trade occurred, Plaintiffs Farmer-Paellmann and RSG sent an email on March 12, 2022, to the Director of the Smithsonian Institution's National Museum of African Art, ("NMAA") Ngaire Blankenberg ("NMAA Director"), explaining the origins of the Benin Bronzes and the harm that the Smithsonian Institution would cause in transferring them to Nigeria and requesting, among other things, that a trust be created for these artifacts.

33.     On March 13, 2022, Plaintiffs sent a letter to the Director and Secretary of the Smithsonian Institution and its Board of Regents reiterating what Ms. Farmer-Paellmann wrote to Blankenberg.

34.     On March 14, 2022, the NMAA Director proposed to arrange a meeting which took place on March 28, 2022.  The NMAA Director and the Archivist of the NMAA indicated that they had no knowledge of the relationship between the Benin Bronzes and the transatlantic slave trade. The NMAA Director stated that she had the exclusive authority to transfer items unless the artifacts had a certain value.

35.     After the meeting of March 28, 2022, Plaintiffs Farmer-Paellmann and RSG discovered that the Smithsonian Institution had written extensively on the Benin Bronzes, noting their role in the slave trade. For example, Defendant's own published article, entitled "The Royal Art of Benin: In the Collection of the National Museum of African Art (1987)," states:

The oba controlled foreign trade. While guns were desired imports, the trade currency was often the manilla, a C-shaped metal ingot that came in a range of sizes and weights. The bracelet like form on the base by the figures right heel is a variant of the standard shape. At first made of copper, most manillas were later made of brass. They were melted for use in art objects or worn as regalia. In 1517, a single ship brought thirteen thousand manillas. Fourty-five manillas were traded for an eighty pound tusk and fifty-seven for a slave (Ryder, 1969, 40, 53).

36.     By April 20, 2022, Plaintiffs Farmer-Paellmann and RSG contacted the Inspector General of the Smithsonian Institution ("OIG") with the complaint that transferring the Benin Bronzes, so critical to the origin and history of slave-holding in the United States, could be fraud, waste, or abuse.

37.     On April 21, 2022, a special agent of the OIG followed up by contacting Plaintiffs Farmer-Paellmann and indicated that an investigation had been opened. On May 4, Plaintiff Farmer-Paellmann placed a follow-up call to the OIG special agent, who provided no update on the status of the complaint.

38.     On May 16, 2022, Plaintiffs Farmer-Paellmann and RSG sent references to scholarly works about the Benin Bronzes that discussed their linkage to the slave trade to the NMAA Director and requested an update on the status of the transfer. The NMAA Director responded the same day, by email that copied Defendant's Office of General Counsel ("OGC"), and expressed interest in working with RSG and its experts to develop future exhibits for the Benin Bronzes. The NMAA Director did not update Plaintiffs on the status of the proposed transfer.

39.     On May 23, 2022, Plaintiffs Farmer-Paellmann and RSG followed up by emailing the NMAA Director, copying the OGC, with the names and the contact information for RSG's historian, curator, and genealogist. They also requested Defendant's help in meeting with Nigerian officials to discuss the issue of co-ownership of the Benin Bronzes and noted that a

third-party foundation had indicated that it would offer funds in the amount of $300 million to reach a resolution. The NMAA Director never replied.

40.     On June 6, 2022, Plaintiffs Farmer-Paellmann and RSG placed a follow-up call to the OIG requesting an update. The OIG provided no update.

41.     On June 15, 2022, two days after Smithsonian Institution announced the transfer of 29 of the 39 Benin Bronzes to Nigeria, Plaintiffs Farmer-Paellmann and RSG emailed the NMAA Director, copying the OGC, and posed four questions: (1) Will the Smithsonian Institution grant co-ownership of the Benin Bronzes to DNA descendants? (2) Did the Board of Regents receive the proof of the slave-trade origin of the Benin Bronzes before resolving to transfer them? (3) What will become of the ten Benin Bronzes not being transferred to Nigeria? and (4) When will the meetings start to plan future exhibits?

42.     On July 5, 2022, Plaintiffs Farmer-Paellmann and RSG followed up by email and telephone with the OIG and received, again, no response.

43.     On July 6, 2022, Plaintiffs Farmer-Paellmann and RSG placed a follow-up telephone call with the OIG special agent who told them that there was no update.

44.     On July 15, 2022, Plaintiffs Farmer-Paellmann and RSG followed up by email and telephone with the OIG's special agent and received, again, no response.

45.     On July 19, 2022, OIG's special agent informed Plaintiffs Farmer-Paellmann and RSG that the matter had been referred to OGC and provided a telephone number for OGC. Plaintiffs called that number, left a message, and never received a response.

46.     On July 28, 2022, the NMAA Director responded by email, copying the OGC, to Plaintiffs Farmer-Paellmann and RSG's email of June 15, 2022, in which she represented that (1) the Smithsonian Institution would let Plaintiffs know when they would be needed for exhibit

planning; (2) the transfer of the Benin Bronzes will be exclusively to Nigeria's National

Commission of Museums and Monuments; (3) more research was needed to link Defendant's

Benin Bronzes to the transatlantic slave trade and to determine that they were made from

payments of manillas for humans; (4) the role of the Kingdom of Benin in the slave trade is "less

documented" than that of other African Kingdoms; and (5) the Kingdom of Benin's role in

slavery appeared to be the subject of a misinformation campaign.

47.    On July 29, 2022, Plaintiffs Farmer-Paellmann and RSG's emailed the OIG

special agent requesting another means to contact the OGC, and he provided an email address.

48.    On September 27, 2022, the day after the Smithsonian Institution announced that

the Benin Bronzes would be transferred to Nigeria on October 11, Plaintiff Farmer-Paellmann

telephoned the OGC and left a message. She received no response. She called again on

September 29 and again received no response. The same day, Plaintiff Farmer-Paellmann sent a

follow-up email to Craig Blackwell, a member of the OGC staff who had been copied on all of

Blankenberg's emails on and after May 16, 2022, and he did not respond.

49.    On the afternoon of October 6, 2022, Kevin Gover of the Smithsonian Institution

emailed Plaintiff Farmer-Paellmann, stating:

> I am the Undersecretary for Museums and Culture at the Smithsonian
> Institution. This message responds to your inquiry about "what has the
> Smithsonian decided to do with the Benin Bronzes?" In April 2022, the
> Smithsonian adopted a policy on ethical returns. Pursuant to the process provided
> under that policy and the National Museum of African Art's collections
> management policy, it was decided that certain Benin bronzes in the collections of
> the Smithsonian be deaccessioned. Those deaccessioned items will be returned to
> the Federal Government of Nigeria, through its National Commission for
> Museums and Monuments.
>
> We know that you have a different perspective regarding to whom these
> works should be returned. While we understand your position, the Smithsonian
> has made its decision, and that decision is consistent with our policy and reflects

12

the best judgment of our museum professionals and others charged with
management and stewardship of our collections.

50.     The October 6, 2022, email from Mr. Gover apparently represents Defendant
Smithsonian Institution's final decision in its administrative process.

## VI.     ALLEGATIONS OF FACT

### A.     THE COMPLETE STORY OF THE BENIN BRONZES

51.     The Benin Bronzes are a collection of iconic sculptures casted from copper alloys,
including brass and bronze. Specialist guilds working for the Royal Court of the oba (king) of
Benin City used the oba's metal wealth to make them.

52.     The Benin royalty practice of using metals and other materials, including elephant
tusks, for fabrication into iconic sculptures began no later than the 11th century C.E. and
continued through the 19th century C.E. The West Africans developed a tradition of casting brass
sculptures that dates to the medieval period.

### B.     EUROPEAN PAYMENT OF BENIN TRAFFICKERS IN BRONZE INGOTS (MANILLAS)

53.     Beginning in the early 1500s, the capitals and courts of the Kingdoms of Benin
and Portugal developed diplomatic relations, through emissaries, and established trade relations.

54.     The Portugese and subsequent European traders thereafter began contracting with
the Kingdom of Benin and its King (Oba) to supply West Africans for transport to the North and
South American continents to work as enslaved people for Europeans.

55.     The royal Beni performed these supply contracts by abducting residents of West
Africa, including from parts of the area now called Nigeria, and delivering them to European
slavers in exchange for the metal (copper) currency called manillas.

### C.     BENIN TRAFFICKERS CRAFTED THE MANILLAS INTO THE BENIN BRONZES

56.     Upon receiving the manillas, the Oba and royal Beni had metalsmiths and craftsmen melt the manillas and cast the metals into iconic sculptures now called the Benin Bronzes.  Those Benin Bronzes crafted from the 16th to the 19th centuries were made from manillas that royal Benin traffickers had received as payment for the West Africans they had kidnapped and sold to Europeans.

### D.     THE BRITISH SEIZE THE BENIN BRONZES

57.     British colonial expansion in the 19th century led to a clash with the Kingdom of Benin. The British gradually expanded into land around the kingdom and an increasing reluctance to accept Benin's trading conditions created an atmosphere of distrust and animosity.

58.     In January 1897, Nigerians attacked officers of the Royal Navy and African porters on a "trade mission" to Benin City and killed seven British delegates and 230 porters. The British retaliated by sending a military expedition against the Kingdom of Benin.

59.     In February 1897, British forces captured Benin City.

60.     In the raid and capture of Benin City, the British seized and removed the Benin Bronzes from Nigeria, and incorporated Benin City into its Empire, where it remained from 1897 to 1960.

### E.     DISPERSAL OF THE BENIN BRONZES

61.     After looting the Benin Bronzes, the Benin Bronzes were disbursed. Many, some 900, are in the British Museum. The Museum's Web site notes:

> Many pieces were commissioned specifically for the ancestral altars of past Obas [Kings] and Queen Mothers. They were also used in other rituals to honour the ancestors and to validate the accession of a new Oba. Among the most well-known of the Benin Bronzes are the cast brass plaques which once decorated the Benin royal palace and which provide an important historical record of the

14

Kingdom of Benin.

62.     The estimated value of the Benin Bronzes ranges from $20,000,000,000 to $30,000,000,000.

**F.     DEFENDANT SMITHSONIAN INSTITUTION'S RECEIPT OF 39 BENIN BRONZES**

63.     After 1897, Defendant Smithsonian Institution acquired at least 39 of the Benin Bronzes.

**G.     DEFENDANT'S RESOLUTION TO DEACCESSION AND TRANSFER THE BENIN BRONZES**

64.     Beginning in March 2022, several European countries considered and undertook to repatriate their Benin Bronzes to Nigeria, apparently in an effort to undo the colonial wrongs of the 19th century.

65.     On June 13, 2022, the Smithsonian Board of Regents voted to de-accession twenty-nine (29) of Defendant's thirty-nine (39) Benin Bronzes and officially remove the Benin Bronzes from its holdings and transfer them to Nigeria.

66.     Defendant Smithsonian Institution noted that it would execute a memorandum of understanding ("MOU") with the National Commission for Museums and Monuments of the Federal Republic of Nigeria to create educational programs, and photography and digital workshops for artists, children and educators.

67.     On September 26, 2022, the Smithsonian Board of Regents voted to de-accession the twenty-nine (29) Benin Bronzes and officially remove the Benin Bronzes from its listed holdings and to repatriate them to Nigeria on October 11, 2022.

68.     On October 4, 2022, Plaintiffs Farmer-Paellmann and RSG retained counsel to seek to enjoin Defendant from deaccessioning the twenty-nine (29) Benin Bronzes and

transferring them to Nigeria on October 11, 2022.

## COUNT I

### ACTING WITHOUT STATUTORY AUTHORITY

69.     Plaintiffs repeat and reallege each and every allegation of Paragraphs 1 through 68 above as though fully set forth herein.

70.     Defendant Smithsonian Institution lacks the statutory authority under Title 20 of the United States Code to transfer assets of the National Museum of African American Art to third parties without consideration.

71.     The authority under 20 U.S.C. § 80q–9 to repatriate Native American "cultural patrimony" objects does not extend to repatriation of cultural objects to Nigeria.

72.     Defendant's upcoming transfer of the Benin Bronzes is *ultra vires* and unauthorized.

## COUNT II

### ANTICIPATORY BREACH OF TRUST TO THE PEOPLE OF THE UNITED STATES

73.     Plaintiffs repeat and reallege each and every allegation of Paragraphs 1 through 68 above as though fully set forth herein.

74.     Defendant Smithsonian Institution is a trust instrumentality of the United States ("Trust"), which consists of its citizens.

75.     Assets of the Smithsonian Institution, the National Collection, make up the Corpus of the Trust and include the Benin Bronzes.

76.     Defendant Smithsonian Institution acts as Trustee for the People of the United States, namely, the citizens of the United States who are the beneficiaries of the National Collection.

16

77.     As Trustee, the Smithsonian Institution has a fiduciary duty to the citizens of the United States.

78.     Defendant Smithsonian Institution's planned transfer of the Benin Bronzes made during the trafficking and enslavement period from the 16th to 19th centuries would breach its fiduciary duty to Plaintiffs and those similarly situated insofar as it would be dissipating invaluable Trust assets that are culturally invaluable and irreplaceable.

79.     Plaintiffs would suffer damages, emotionally and potentially economically, from Defendant Smithsonian Institution's breach of fiduciary duty in transferring the Benin Bronzes to Nigeria.

80.     Defendant Smithsonian Institution's breach of its fiduciary duty to the descendants of slave traffickers would cause Plaintiffs damages.

## <u>COUNT III</u>

## ANTICIPATORY BREACH OF TRUST TO UNITED STATES CITIZENS DESCENDED FROM WEST AFRICANS TRAFFICKED BY BENIN ROYALTY

81.     Plaintiffs repeat and reallege each and every allegation of Paragraphs 1 through 68 above as though fully set forth herein.

82.     The Benin Bronzes made from copper and copper alloys that Europeans paid to royal Beni traffickers for West African enslaved people that are in the possession of Defendant Smithsonian Institution constitute payment for ancestors of many thousands of United States citizens.

83.     These Benin Bronzes are central to the Smithsonian's core activities of scholarship, discovery, exhibition, and education and are a vital resource that constitute or should constitute a common law trust for the benefit of descendants of West Africans whom royal Beni

traffickers and European slave-traders kidnaped and enslaved.

84.     Metallurgical experts can verify the European origin of the copper alloys present in the Benin Bronzes made with manillas from the Portuguese and other subsequent European slave traders for purposes of identifying the specific Benin Bronzes made from manillas used to pay for kidnaped West Africans.

85.     Defendant Smithsonian Institution acts as Trustee for the citizens of the United States who are descendants of those enslaved by royal Benin traffickers.

86.     As Trustee, the Smithsonian Institution has a fiduciary duty to the citizens of the United States.

87.     Defendant Smithsonian Institution's planned transfer of the Benin Bronzes made during the trafficking and enslavement period from the 16th to 19th centuries would breach its fiduciary duty to Plaintiffs and those similarly situated insofar as it would be dissipating invaluable Trust assets that are culturally invaluable and irreplaceable.

88.     Plaintiffs would suffer damages, emotionally and potentially economically, from Defendant Smithsonian Institution's breach of fiduciary duty in transferring the Benin Bronzes to Nigeria.

89.     Defendant Smithsonian Institution's breach of its fiduciary duty to the descendants of slave traffickers would cause Plaintiffs damages.

## COUNT IV

## UNJUST ENRICHMENT

90.     Plaintiffs repeat and reallege each and every allegation of Paragraphs 1 through 68 above as though fully set forth herein.

91.     Defendant Smithsonian Institution has no contractual obligations to transfer its

Benin Bronzes to descendants of Beni, Nigerians, or other West Africans responsible for having enslaved American-Africans.

92.     Citizens of the British North American colonies and citizens of the United States built enormous wealth from the unpaid labor of enslaved West Africans, including the many whom royal Beni traffickers abducted and sold to slave-traders for manillas.

93.     The sale-and-purchase transactions between American slave-holders, European slave-traders, and royal Beni traffickers enriched all three groups at the exclusive expense of the West Africans and their descendants who were forced into enslavement.

94.     If Defendant Smithsonian Institution "gifts" the Benin Bronzes to the royal Beni traffickers, it would be an agent of (1) the unjust enrichment of those who engaged in all-too-common crimes against humanity, without receipt of any compensation; and (2) the unjust impoverishment of those whose lives were lost and destroyed for such metals and the objects fashioned therefrom.

95.     On the grounds of fairness and justice, Defendant Smithsonian Institution has a moral and legal obligation to not enrich descendants of those with the assets they obtained through their brutality of kidnapping and trafficking human beings.

96.     Paying descendants of human traffickers with the fruits of their vile transactions is a statement that condones such conduct and is offensive to the many thousands of United States citizens of West African descent whose ancestors suffered savage treatment as enslaved people in North America.

**PRAYER FOR RELIEF**

As and for relief, Plaintiffs respectfully request that the Court:

1.     Order that Defendant Smithsonian Institution be permanently enjoined from

transferring title to those Benin Bronzes that were fabricated from the 16th century to the 19th century and that were made from metals traded to the Kingdom of Benin in exchange for enslaved people of Western Africa; and

2.      Grant such other and further relief as the Court deems appropriate.


Dated:  October 7, 2022

/s/ Adriaen M. Morse Jr.
Adriaen M. Morse Jr. (DC Bar No. 483347)
Cory Kirchert (D.C. Bar No. Pending)
Lionel André (D.C. Bar No. 422534)
SECIL LAW PLLC
1701 Pennsylvania Avenue, NW, Suite 200
Washington, D.C. 20006
Tel:  202.417.8232
amorse@secillaw.com

*Counsel for Plaintiffs*