**\*\*\*EMERGENCY MOTION\*\*\***


# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DEADRIA FARMER-PAELLMANN and RESTITUTION STUDY GROUP, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | **EMERGENCY MOTION** |
| v. | Civil Action No.  1:22-cv-3048 ORAL ARGUMENT REQUESTED |
| SMITHSONIAN INSTITUTION, | |
| Defendant. | |


**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR EMERGENCY TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Adriaen M. Morse (D.C. Bar No. 483347)
Cory Kirchert (D.C. Bar No. Pending)
Lionel André (D.C. Bar No. 422534)
SECIL LAW PLLC
1701 Pennsylvania Avenue, NW, Suite 200
Washington, D.C. 20006
Tel:  202.417.8232
amorse@secillaw.com

*Counsel for Plaintiffs*

**\*\*\*EMERGENCY MOTION\*\*\***

**\*\*\*EMERGENCY MOTION\*\*\***

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ................................................................. 1

II.    SUMMARY OF FACTS ...................................................................... 3

    A.    Background of Benin ................................................................. 3

    B.    Attempts to Communicate with the Smithsonian .................................... 6

III.   LEGAL STANDARD FOR TEMPORARY RESTRAINING ORDER ......................... 16

IV.   ARGUMENT ............................................................................... 17

    A.    Plaintiffs are likely to succeed on the merits ....................................... 17

        (1)    Plaintiffs will satisfy the requirements to show unjust
              enrichment .............................................................. 17

        (2)    Plaintiffs will show that Defendant's transfer of the Benin
              Bronzes to Nigeria dissipates the corpus of the Smithsonian
              Institution's trust assets, harms intended beneficiaries, and
              is *ultra vires* and without statutory authority ........................... 19

    B.    Plaintiffs stand to suffer irreparable injury in the absence of relief ..................... 21

    C.    The Smithsonian Institution would not be harmed by a Temporary
Restraining Order or Preliminary Injunction .................................................. 22

    D.    Delay to allow for consideration of the critical interests at issue
would be in the public interest .............................................................. 23

CONCLUSION ................................................................................. 24

**\*\*\*EMERGENCY MOTION\*\*\***

***EMERGENCY MOTION***

## TABLE OF AUTHORITIES

### CASES

*Alf v. Donley*,
666 F. Supp. 2d 60 (D.D.C. 2009)....................................................................... 16

*Alsco-Harvard Fraud Litigation*,
523 F. Supp. 790 (D.D.C. 1981)......................................................................... 18

*Cahill v. Bryan*,
184 F.2d 277 (D.C. Cir. 1950)........................................................................... 18

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006)........................................................................... 21

*Citizens for Responsibility and Ethics in Washington v. Cheney*,
577 F. Supp. 2d 328 (D.D.C. 2008)..................................................................... 16

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
58 F.3d 738 (D.C. Cir. 1995)............................................................................. 16

*Cunningham v. Brown*,
265 U.S. 1 (1924)............................................................................................ 18

*Fraternal Order of Police Library of Cong. Labor Comm. v. Library of Cong.*,
639 F. Supp. 2d 20 (D.D.C. 2009)...................................................................... 21

*Gomez v. Kelly*,
237 F. Supp. 3d 13 (D.D.C. 2017)...................................................................... 16

*Independent Coal & Coke Company v. United States*,
274 U.S. 640 (1926)......................................................................................... 18

*Mandley v. Backer*,
121 F.2d 875 (D.C. Cir. 1941)........................................................................... 18

*Osin v. Johnson*,
243 F.2d 653 (D.C. Cir. 1957)........................................................................... 17

*Restatement: Harrington v. Emmerman*,
186 F.2d 757 (D.C. Cir. 1950)........................................................................... 17

*Reynolds v. Whitin Machine Works*,
167 F.2d 78 (4th Cir. 1945), cert. denied 334 U.S. 844 (1948)............................. 18

***EMERGENCY MOTION***

***EMERGENCY MOTION***

*St. Louis & San Francisco & Co. v. Spiller*,
  274 U.S. 304 (1926)........................................................................................ 18

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
  559 F.2d 841 (D.C. Cir. 1977)...................................................................... 16

**STATUTES**

20 U.S.C.
  § 50....................................................................................................... 23
  § 53....................................................................................................... 19
  § 80q–9................................................................................................. 19

***EMERGENCY MOTION***

**\*\*\*EMERGENCY MOTION\*\*\***

## I.      PRELIMINARY STATEMENT

This case presents a difficult moral quandary that can only be resolved through in-depth

research and thoughtful stewardship of priceless resources currently in the hands of Defendant,

the Smithsonian Institution. In a laudable desire to rectify the deplorable historical practice of

militarily superior governments plundering the arts and treasures of conquered peoples around

the world—in this case the British theft of the Kingdom of Benin's royal treasury as part of a

punitive military expedition in 1897—Defendant has decided to "deaccession" 29 works of art in

its collection, a portion of the several thousand stolen metal plaques and sculptures that are

known as the "Benin Bronzes," and has agreed to transfer these items to Nigeria. However, in

the process Defendant has ignored the fact that the parties to whom it is entrusting the Benin

Bronzes—Nigeria's National Commission for Museums and Monuments ("NCMM"), which will

in turn entrust the bronzes to the Edo Museum of West African Art ("Edo Museum")—are

themselves the descendants of oppressors:[1] the Benin Bronzes were literally created out of

metals that were received by the Kingdom of Benin in payment from Portuguese, English, and

American slavers in exchange for people who the Kingdom had enslaved and who the slavers

then transported across the Atlantic as part of the transatlantic slave trade. The metal received in

the transaction between Benin's monarch and the European and American slavers (in the form of

---

[1] The current oba, or king, of Benin is the great-grandson of the monarch who was deposed by
the British. The current governor of Edo State, Nigeria (in which the Edo Museum will be
located), is the great-grandson of the acting ruler of Benin installed by the British. *See, e.g.*,
David Frum, *Who Benefits When Western Museums Return Looted Art?*, THE ATLANTIC (Sep.
14, 2022), https://www.theatlantic.com/magazine/archive/2022/10/benin-bronzes-nigeria-return-
stolen-art/671245/. His Royal Highness Crown Prince Ezelkhae Ewuare, the son of the current
oba of Benin, serves as a trustee of the Edo Museum of West African Art. *See* EDO MUSEUM OF
WEST AFRICAN ART, People, https://www.emowaa.com/partners. He is joined by the wealthy
entrepreneur who is spearheading the project to return Benin Bronzes to the Edo Museum,
Phillip Inehacho, and a collection of wealthy and influential elites from Nigeria and elsewhere.
*Id.*

**\*\*\*EMERGENCY MOTION\*\*\***

***EMERGENCY MOTION***

half-circle ringlets called "manillas") was melted down to create many of the works that comprise the Benin Bronzes. Many of those enslaved people were transported to the United States and remained here. Their descendants, Plaintiffs in this matter, may readily be identified through DNA matching and have a cognizable interest in the Benin Bronzes. Defendant's decision to send its 29 Benin Bronzes to Nigeria was taken without any consultation with the descendants of those whose freedom, health, and very lives were exchanged for the metal that went into these artifacts.

Defendant's objective to correct one injustice substitutes a different injustice: depriving Plaintiffs of their ability to view, enjoy, and study the artifacts for which their ancestors paid a terrible price. The transshipment of these objects may assuage feelings of guilt, but keeping the objects here, to provide lessons about human history, the origins of slavery, and the price of human bondage, should also be a consideration. The Benin Bronzes do not "belong" to Nigeria or the Edo Museum any more than the people they exchanged for the metals that went into the objects "belonged" to the oba of Benin. The fact that this massive injustice took place can best be appreciated by the descendants of those who were enslaved, and many of those people are here in the United States.

Plaintiffs do not seek to assert possessory rights or monetary claims to the Benin Bronzes—although they surely could. Instead, Plaintiffs have asked Defendant to maintain possession and control over the artifacts[2] and to set up educational programs and internship

---

[2] Defendant, through its Director of the Smithsonian Institution's National Museum of African Art, rebuffed Plaintiff Resolution Study Group's ("RSG") suggestions at a meeting on March 28, 2022, and then refused to meet again, although via email she encouraged RSG to remain involved. She refused to provide further information on the status of the transfer of the bronzes. Defendant's Inspector General, at RSG's request, began an investigation and then stopped, claiming that Defendant's Office of the General Counsel ("OGC") had stepped in. Evidently, Defendant refuses to consider slowing its headlong rush to send the Benin Bronzes to Nigeria—it

***EMERGENCY MOTION***

***EMERGENCY MOTION***

experiences aimed at the children who are descendants of the enslaved people trafficked to the United States and held in bondage here. Such programs would educate, enrich, and restore dignity to the lives of people whose origins were systematically suppressed during and after their time in captivity. Plaintiffs do not even object to programs and exchanges with Nigeria and the Edo Museum so long as they are consulted and given the opportunity to suggest ways in which such programs could benefit themselves and their descendants.

A temporary restraining order is necessary to preserve the status quo in this case in order to give the Court sufficient time to adjudicate the merits of this matter. In the absence of such an order, the Benin Bronzes will have been transferred out of this Court's jurisdiction, the case will be moot, and it will be impossible to remedy the harm that Plaintiffs suffer from the disclosure. The subject matter of this case, which touches on key human rights issues and the mission of the agency entrusted with preserving this nation's history, including its history regarding human slavery, warrants careful scrutiny before irrevocable action is taken.

## II.     SUMMARY OF FACTS

### A.     Background of Benin

The Kingdom of Benin was one of the first indigenous states in West Africa that came into contact with merchants coming from western Europe, first the Portuguese and later the Dutch, British and French. (Declaration of Deadria Farmer-Paellmann, ¶ 7; at 6-7) (hereinafter Farmer-Paellmann Decl.).  The Kingdom traces its origins to the twelfth and thirteenth centuries,

---

intends to "officially deaccession[] [the bronzes] and return[] [them] to Nigeria in a private ceremony on October 11." *See*, Smithsonian Institute, *National Museum of African Art Celebrates Nigerian Culture and Creativity With +234 Connect Festival* (Sep. 26, 2022), https://www.si.edu/newsdesk/releases/national-museum-african-art-celebrates-nigerian-culture-and-creativity-234-connect. Defendant's online announcement was Plaintiff RSG's first and only indication that the deaccessioning would take place October 11, 2022. Defendant's OGC has ignored multiple attempts by Plaintiff RSG to contact them.

***EMERGENCY MOTION***

and its history connects the country closely with the history of the Yoruba to the west and the Igbo to the east. (Farmer-Paellmann Decl., ¶ 7; at 7.). Benin was and is located to the west of the lower Niger River valley with ports on the Atlantic in the Niger River delta, and should not be confused with the modern Republique du Benin, with which it has no direct connection. (Farmer-Paellmann Decl., ¶ 7; at 9-11.). The Kingdom of Benin was connected to the western Niger delta via various tributaries of the Niger River, the most important being the Forcados River with its links to Warri. (Farmer-Paellmann Decl., ¶ 7; at 11-12.). Until the late eighteenth century, Benin also controlled the lagoons to the west of the Niger delta as far as Lagos. (Farmer-Paellmann Decl., ¶ 7; at 13-14.). While the exact number of enslaved Africans leaving Benin over the course of the slave trade is not known, it is known that one of the most important imports from Europe during the period was brass manillas, which are bracelet-shaped items that were used locally in Benin and areas to the west as a currency. (Farmer-Paellmann Decl., ¶ 7; at 14-17.).

The brass manillas were also melted down and fashioned into the extensive collection of plaques, statutes, and other items that were important symbols associated with Benin kingship and ritual life in the kingdom. (Farmer-Paellmann Decl., ¶ 7; at 17-19.). In the 2018 book entitled, *The Benin Monarchy: An Anthology of Benin History*, by Oba Ewuare II Foundation 2018, there is an admission by the Kingdom of Benin that they made the Benin bronzes using manillas they were paid in exchange for people they enslaved. (Farmer-Paellmann Decl., ¶ 5; at 9-11.). This started with Benin's trade with the Portuguese in the sixteenth century, during which time Benin was a major exporter of captives. (Farmer-Paellmann Decl., ¶ 6; at 7-8.). Their slave trading for manillas lasted for 300 years and included British, Dutch, and American slave traders. (Farmer-Paellmann Decl., ¶ 5; at 12-13.). The principal places of purchase were in Benin river, Aghway, Lagos, Onim, Oere, and Rio Forcados. (Farmer-Paellmann Decl., ¶ 6; at

***EMERGENCY MOTION***

13-14.).  In a book entitled *Benin and the Europeans 1485-1897*, the author Alan Ryder says the typical price that Europeans paid the Kingdom for an enslaved man was 57 manillas, but they paid the Kingdom 50 manillas for women. (Farmer-Paellmann Decl., ¶ 5; at 16-18.).

The Kingdom stopped trading men and only traded women in the seventeenth century. (Farmer-Paellmann Decl., ¶ 5; at 13-14.).  They resumed trading both genders in the eighteenth century and continued until the Punitive Expedition of 1897. (Farmer-Paellmann Decl., ¶ 5; at 14-15.). The Benin Empire and its kings were the mightiest powers on the eastern slave coast. (Farmer-Paellmann Decl., ¶ 6; at 16-17.). The Transatlantic slave trade database indicates that during the 300 years of slave trading, at least one million people are believed to have been enslaved by the Kingdom of Benin, (Farmer-Paellmann Decl., ¶ 5; at 19-20), with 308 voyages that took at least 103,000 captives from the Kingdom of Benin to the Americas. (Farmer-Paellmann Decl., ¶ 6; 12-13.).  In the United States, most of those people were enslaved in South Carolina where they were bred to increase their numbers. (Farmer-Paellmann Decl., ¶ 5; at 21-22.). Today, 82% of Jamaicans and other Caribbeans, and 93% of the 40 million African Americans have DNA from enslaved ancestors from Nigeria. (Farmer-Paellmann Decl., ¶ 5; at 22-24.).

After the Punitive Expedition of 1897, approximately 10,000 objects were looted, including bronze plaques, sculptures and other valuable objects, and taken away. (Farmer-Paellmann Decl., ¶ 6; at 23-25.).  At least 3,000 Benin artworks are now owned by public museums or held in private collections around the world, especially in Britain, Germany, and the United States. (Farmer-Paellmann Decl., ¶ 8; at 3-4.).  Nigerians have long demanded the return of the artworks. (Farmer-Paellmann Decl., ¶ 8; at 5.).  In 2007, a consortium of Western museums joined Nigerians in a "Benin Dialogue Group" to open discussions about repatriation.

(Farmer-Paellmann Decl., ¶ 8; at 5-7.).  The dialogue moved slowly for a decade until the

George Floyd protests of 2020 jolted the group into hyperactivity. (Farmer-Paellmann Decl., ¶ 8;

at 7-8.).  Entities in possession of the artworks, such as the German government and the Jesus

College at the University of Cambridge, have begun surrendering Benin objects back to Nigerian

authorities. (Farmer-Paellmann Decl., ¶ 8; at 8-10.).  The Smithsonian Institution, which is in

possession of 39 Benin Bronzes, has pledged to give most of its collection to a museum in

modern-day Benin City. (Farmer-Paellmann Decl., ¶ 8; at 10-12.).  The concern lies with what it

means to return an object "to Nigeria," and what will happen to objects once they get there.

(Farmer-Paellmann Decl., ¶ 8; at 12-14.).

B.      **Attempts to Communicate with the Smithsonian**

Deadria Farmer-Paellmann is the Executive Director of the Restitution Study Group

(RSG), which is a New York non-profit company concerned with slavery justice. (Farmer-

Paellmann Decl., ¶ 1; at 1-2.).  Amongst the RSG's various projects, they conduct research to

identify parties complicit in slavery and the Transatlantic Slave Trade. (Farmer-Paellmann Decl.,

¶ 1; at 2-3.). Ms. Farmer-Paellmann is a direct descendant of enslaved people from West Africa.

(Farmer-Paellmann Decl., ¶ 2; at 1.). On March 8, 2022, Ms. Farmer-Paellmann read an article in

the Washington Post explaining that the Smithsonian Institution reached a decision to repatriate

39 Benin Bronzes to Nigeria to be displayed in a museum in Benin City—the home of the

Kingdom of Benin. (Farmer-Paellmann Decl., ¶ 3; at 1-3.). Ms. Farmer-Paellmann was distressed

by this news because, through her research while in law school in 1999, she discovered that the

Benin kingdom made the bronzes with melted manilla currency exchanged for people the

kingdom captured and sold into the Transatlantic slave trade. (Farmer-Paellmann Decl., ¶ 3; at 3-

6.). On March 12, 2022, Ms. Farmer-Paellmann, in her capacity as Executive Director of the

***EMERGENCY MOTION***

RSG, sent a letter to the Director of the Smithsonian Institute's National Museum of African Art (the Director). (Farmer-Paellmann Decl., ¶ 4; at 1-2.). In that letter, Ms. Farmer-Paellmann told the Director that the Smithsonian's decision to return the Benin Bronzes excluded an interested party, namely, people like Ms. Farmer-Paellmann who are descendants of the Africans who were enslaved and sold into transatlantic slavery by the Benin Kingdom in exchange for manillas melted down to make the bronzes. (Farmer-Paellmann Decl., ¶ 4; at 3-6.). Ms. Farmer-Paellmann had a 23 & Me DNA report conducted, and the report shows that her DNA ancestry can be traced back to two ports controlled by the Kingdom of Benin during the transatlantic slave trade – Warri and Lagos. (Farmer-Paellmann Decl., ¶ 2; at 1-3.). The report indicates that over 27% of her DNA is from the area known today as Nigeria. (Farmer-Paellmann Decl., ¶ 2; at 3.). Ms. Farmer-Paellmann's ancestors were enslaved in communities near Charleston, South Carolina, which is the main port in the United States where people enslaved by the Benin Kingdom disembarked and were sold. (Farmer-Paellmann Decl., ¶ 2; at 4-6.). Ms. Farmer-Paellmann urged the Director to change the Smithsonian's transfer plan and include all the proper beneficiaries as owners of the Benin Bronzes. (Farmer-Paellmann Decl., ¶ 9; at 5-6.). Ms. Farmer-Paellmann asked the Smithsonian to hold them in trust for Nigeria and the DNA descendants of enslaved people from the region. (Farmer-Paellmann Decl., ¶ 9; at 6-8.). In addition to requesting a meeting to discuss the matter, Ms. Farmer-Paellmann offered to share documents with the Director to verify the source of the metal that made the bronzes. (Farmer-Paellmann Decl., ¶ 9; at 8-9.).

On March 13, 2022, Ms. Farmer-Paellmann sent a letter to the Smithsonian Institution's Director and Secretary Lonnie Bunch, and the full Board of Regents, including Vice President Kamala Harris and Chief U.S. Supreme Court Justice John Roberts. Jr. requesting a meeting to

discuss the matter and to verify the source of the metal that made the Bronzes, but she received no reply. (Farmer-Paellmann Decl., ¶ 10; at 1-4.). On March 14, 2022, the Director responded to the email sent to her, stating that her assistant would call to set up a meeting with Ms. Farmer-Paellmann. (Farmer-Paellmann Decl., ¶ 11; at 1-2.). Later that day, the assistant contacted Ms. Farmer-Paellmann to set up a zoom meeting. (Farmer-Paellmann Decl., ¶ 11; at 2-3.). During this call, Ms. Farmer-Paellmann was told it was good to hear from her, and that she should keep expressing her concerns. (Farmer-Paellmann Decl., ¶ 11; at 3-4.). The following day on March 15, Ms. Farmer-Paellmann confirmed the zoom meeting date of April 5, 2022, via email and requested that the Director not transfer the bronzes before that date. (Farmer-Paellmann Decl., ¶ 12; at 1-2.). Ms. Farmer-Paellmann also requested that the Board of Regents put a hold on the transfer of the relics until the issue of the DNA descendants being designated as co-owners could be resolved. (Farmer-Paellmann Decl., ¶ 12; at 2-4.). Ms. Farmer-Paellmann also asked for information on any official procedure to inquire with the Board of Regents on the matter, but the Director did not share any information about such a procedure. (Farmer-Paellmann Decl., ¶ 12; at 4-6.). On March 19, 2022, Ms. Farmer-Paellmann sent a letter with the list of her counsel who would attend the meeting with her. (Farmer-Paellmann Decl., ¶ 13; at 1-2.). On March 20, 2022, the Director asked Ms. Farmer-Paellmann why she invited lawyers to the meeting and expressed a preference for meeting without counsel at this stage as it was her belief it was not necessary. (Farmer-Paellmann Decl., ¶ 14; at 1-4.). The Director indicated that if Ms. Farmer-Paellmann was expecting more from the meeting, that the Director would need to invite her general counsel. (Farmer-Paellmann Decl., ¶ 14; at 1-2.). The meeting took place on March 28, 2022, and Ms. Farmer-Paellmann attended without counsel. (Farmer-Paellmann Decl., ¶ 15; at 1-2.). During that meeting attended by the Director and her museum Archivist, Ms. Farmer-Paellmann

explained the reason for the co-ownership claim, and explained that Benin bronzes were made with manillas exchanged for their enslaved ancestors. (Farmer-Paellmann Decl., ¶ 15; at 2-4.). The Director explained that she did not know that the Benin bronzes had any connection to the Transatlantic slave trade or slavery, and that she had never heard of a manilla. (Farmer-Paellmann Decl., ¶ 15; at 4-7.). Ms. Farmer-Paellmann then described manillas as small c-shaped metal bracelets, to which the Director responded saying that she thinks she saw a manilla depicted in a Benin bronze, but did not know what it was . (Farmer-Paellmann Decl., ¶ 15; at 7-9.). The Director insisted that the bronzes in their collection have nothing to do with the slave trade, and that she doubts anyone could prove otherwise. (Farmer-Paellmann Decl., ¶ 15; at 9-10.). During the meeting, Ms. Farmer-Paellmann told the Director and Archivist that it is hard to believe they do not know about the slave trade origin of the relics because nearly any book about the Benin bronzes includes something about this history. (Farmer-Paellmann Decl., ¶ 15; at 10-12.). Ms. Farmer-Paellmann told them that extensive scholarship exists on the matter and that she would get it to them. (Farmer-Paellmann Decl., ¶ 15; at 12-13.). During the March 28, 2022, meeting, Ms. Farmer-Paellmann expressed concern over the safety of the bronzes in Nigeria, where there was a report of a repatriated bronze being sold to a private collector in the West. (Farmer-Paellmann Decl., ¶ 16; at 1-3.). The Director expressed that as an African national, she finds it offensive that people think Africans cannot manage their own artifacts. (Farmer-Paellmann Decl., ¶ 16; at 3-4.). The Director said that she took the bronzes down when she took charge of the museum and that if they were going to be owned by anyone besides Nigeria, she would not rehang them. (Farmer-Paellmann Decl., ¶ 16; at 4-6.). Ms. Farmer-Paellmann asked if the Board of Regents would need to vote on the transfer, to which the Director responded she has exclusive authority to transfer them and she planned to transfer them to Nigeria, but if they have

***EMERGENCY MOTION***

a certain monetary value, the Board would have to vote to transfer. (Farmer-Paellmann Decl., ¶ 16; at 6-8.). The Archivist said that they do not place monetary value on the bronzes because they are priceless cultural artifacts. (Farmer-Paellmann Decl., ¶ 16; at 8-10.). Ms. Farmer-Paellmann informed them that one Oba head sculpture sold for $13 million in 2016, evidencing the great value the bronzes hold. (Farmer-Paellmann Decl., ¶ 16; at 10-11.). Ms. Farmer-Paellmann asked for the process to get a vote from the Board of Regents but did not receive an answer. (Farmer-Paellmann Decl., ¶ 16; at 11-12.).

Following the meeting, Ms. Farmer-Paellmann gathered several of the top scholar books on the Benin bronzes to draft a memo to the Director. (Farmer-Paellmann Decl., ¶ 17; at 1-2.). In one such book at the Smithsonian, Ms. Farmer-Paellmann found excerpts that said the bronzes were made with manillas from the slave trade:

> The increased availability of previously scarce copper and brass after contact with the Portuguese is often cited to explain the increase in Benin artistic production of metal objects such as plaques.
>
> The oba controlled foreign trade. While guns were desired imports, the trade currency was often the manilla, a C-shaped metal ingot that came in a range of sizes and weights. The bracelet like form on the base by the figure's right heel is a variant of the standard shape. At first made of copper, most manillas were later made of brass. They were melted for use in art objects or worn as regalia. In 1517, a single ship brought thirteen thousand manillas to Benin. Forty-five manillas were traded for an eighty pound tusk and fifty-seven for a slave (Ryder 1969, 40, 53).

BYRNA FREYER, ROYAL ART OF BENIN: IN THE COLLECTION OF NATIONAL MUSEUM OF AFRICAN ART 43, 54 (1987). (Farmer-Paellmann Decl., ¶ 17.).

Ms. Farmer-Paellmann then checked the Smithsonian National Museum of African Art's website and saw entries acknowledging that the bronzes were made with metal ingots from the slave trade. (Farmer-Paellmann Decl., ¶ 18; at 1-2.). One such entry stated: "The half figures depict Portuguese. Trade between Benin and Portugal increased the wealth and power of the oba

***EMERGENCY MOTION***

and his court and provided the ingots that were recast into art such as this plaque." (Farmer-Paellmann Decl., ¶ 18; at 3-5.). It was at this point that Ms. Farmer-Paellmann became increasingly concerned with the information provided to her by the Director and Archivist during their meeting on March 28, 2022. (Farmer-Paellmann Decl., ¶ 19; at 1-2.).

On May 16, 2022, Ms. Farmer-Paellmann and the RSG followed up with the Director for the status of the 39 bronzes in their collection and shared the slave trade origin cites and quotes with her. (Farmer-Paellmann Decl., ¶ 20; at 1-2.). The Director responded the same day via email, inviting the RSG to work with the Director, and expressing a willingness to collaborate with RSG's historian and curator to help develop future exhibits around the Benin bronzes, but did not give an update on the transfer of the bronzes. (Farmer-Paellmann Decl., ¶ 20; at 2-5.). Craig Blackwell, an attorney at the Smithsonian General Counsel's office, was copied in the Director's email. (Farmer-Paellmann Decl., ¶ 20; at 5-6.). On May 23, 2022, Ms. Farmer-Paellmann and the RSG followed up to with the Director to give her the names and contact information for RSG's historian, curator and genealogist. (Farmer-Paellmann Decl., ¶ 21; at 1-2.). Ms. Farmer-Paellmann also asked for help to meet with Nigeria on the co-ownership issue. (Farmer-Paellmann Decl., ¶ 21; at 2-3.). Also, Ms. Farmer-Paellmann expressed that a foundation was offering $300 million to help the RSG reach a shared resolution with the Director. (Farmer-Paellmann Decl., ¶ 21; at 3-4.). The Director never responded. (Farmer-Paellmann Decl., ¶ 21; at 4.). Craig Blackwell was copied in this email as well. (Farmer-Paellmann Decl., ¶ 21; at 4.).

On June 15, 2022, Ms. Farmer-Paellmann and the RSG followed up with the Director and asked about the latest news about the Smithsonian Board of Regents voting to transfer 29 of the 39 Benin Bronzes to Nigeria. (Farmer-Paellmann Decl., ¶ 22; at 1-3.). During this

communication, Ms. Farmer-Paellmann and the RSG asked the following questions: 1. Will the Smithsonian grant co-ownership of the bronzes to DNA descendants? 2. Did the Board of Regents get the proof of slave trade origin Ms. Farmer-Paellmann and the RSG gave the Director before they voted to transfer the bronzes? 3. What will become of the 10 bronzes that are not being transferred to Nigeria? and 4. When will the meetings start to plan future exhibits? (Farmer-Paellmann Decl., ¶ 22; at 3-6.). Craig Blackwell was copied in this email as well. [(Farmer-Paellmann Decl., ¶ 22; at 7.).

On July 28, 2022, the Director responded to Ms. Farmer-Paellmann saying they would let her and the RSG know when they would be needed for exhibit planning. (Farmer-Paellmann Decl., ¶ 23; at 1-2.). The Director stated the transfer of the bronzes will be exclusively to Nigeria's National Commission of Museums and Monuments. (Farmer-Paellmann Decl., ¶ 23; at 2-3.). Furthermore, the Director said that more research was needed to link the Benin Bronzes in question to the Transatlantic slave trade and to make the case that their bronzes were made specifically from manillas exchanged for humans. (Farmer-Paellmann Decl., ¶ 23; at 2-5.) The Director then suggested that the role of the Kingdom of Benin in the slave trade is less documented than other African kingdoms and that confusion was being perpetuated about the Benin Kingdom's role in slavery. (Farmer-Paellmann Decl., ¶ 23; at 5-6.). Once again, Craig Blackwell was copied in these communications. (Farmer-Paellmann Decl., ¶ 23; at 7.). On July 29, 2022, Ms. Farmer-Paellmann and the RSG responded asking how they reached their decision and inviting them to do a joint effort of due diligence with the RSG. (Farmer-Paellmann Decl., ¶ 24; at 1-2.). Ms. Farmer-Paellmann also told the Director that top scholarship on the Benin bronzes differs from the conclusion the Director and the Smithsonian reached. (Farmer-Paellmann Decl., ¶ 24; at 2-3.).

***EMERGENCY MOTION***

On August 10, 2022, Ms. Farmer-Paellmann and the RSG sent an email to the Director asking the Smithsonian to reconsider their decision in light of the fact that news was finally breaking regarding the co-ownership request, that the world would learn about the unjust transfers, and that the Smithsonian would be on the wrong side of history; the RSG received no response to this email. (Farmer-Paellmann Decl., ¶ 25; at 1-4.). On August 20, 2022, Ms. Farmer-Paellmann and the RSG again sent an email to the Director giving her the update on the unstable safety conditions in Nigeria, and particularly Benin City, which is the place where the Smithsonian bronzes would be returned. (Farmer-Paellmann Decl., ¶ 26; at 1-3.). In this email, Ms. Farmer-Paellmann pointed out that twenty bodies had been found in a ritual shrine appearing to be subjects of human sacrifice. (Farmer-Paellmann Decl., ¶ 26; at 3-4.). The Oba of Benin issued a letter suspending his Ezomo, which is his War Chief, who was the supervisor of the town. (Farmer-Paellmann Decl., ¶ 26; at 4-5.). The reason for suspension was anti-Palace activities. (Farmer-Paellmann Decl., ¶ 26; at 5-6.). The sacking order letter was dated for August 8, 2022, which was the week before the story about the corpses broke in the news, but the suspension was supposed to have happened in January of 2022. (Farmer-Paellmann Decl., ¶ 26; at 6-8.). On September 29, 2022, Ms. Farmer-Paellmann called the General Counsel's Office and received no answer. (Farmer-Paellmann Decl., ¶ 27; at 1-2.). That same day, Ms. Farmer-Paellmann sent a follow-up email to Craig Blackwell inquiring about the status of her complaint. The email states as follows:

Greetings Mr. Blackwell,

What is the status of our complaint against the transfer of the Smithsonian collection of Benin bronzes to Nigeria? We know there is a ceremony scheduled for October 11, 2022, for the Smithsonian National Museum of African Art to transfer the bronzes to Nigeria. [1] Based on our communications with Ngaire Blankenberg, Director of the Smithsonian National Museum of African Art, it is clear that this transfer is happening under fraudulent circumstances. Attached

***EMERGENCY MOTION***
13

***EMERGENCY MOTION***

please find her most recent statement dated July 28, 2022, regarding the ability to determine if the bronzes in the Smithsonian collection come from slave trade manillas. You will also see my follow-up letter dated May 16, 2022, to which she is responding. This slave trade origin is a critical factor in transferring the bronzes. To ignore this origin would allow transfer of the bronzes without considering beneficiaries who have registered a timely co-ownership claim -- slave descendants -- as beneficiaries that the Smithsonian must consider before finalizing repatriation. Indeed, we registered our claim before a final repatriation agreement was signed with Nigeria. We sent follow-up email to Craig Blackwell for status of our complaint. Ms. Blankenberg's statement in the attached letter is absolutely fraudulent. The slave trade origin of the bronzes is a settled matter. [2] The Benin Kingdom's own admission that the bronzes made from the 16th century and after, are made from manillas they were paid for enslaved people they sold into the transatlantic slave trade, is published in their 2018 book Benin Monarchy. [3]

We believe the Board of Regents was misled into approving the transfer of the bronzes. Certainly, if Ms. Blankenberg's fraudulent statement was provided to the Board of Regents, which includes Vice President Kamala Harris, and Chief Supreme Court Justice John Roberts, the potential transfer would be illegal and must be stopped.

We have shared other proof of the slave trade origin of the Benin bronzes with Ms. Blankenberg from a Smithsonian Institution book, from the Smithsonian's Benin bronze website entries, and from the top scholars on the Benin bronzes[4], [5], [6] -- see the attached letter. She chooses to ignore these facts and pretend the origin cannot be determined or linked to the bronzes in the Smithsonian collection.

Ms. Blankenberg seems to be pursuing her own pro-Africa agenda at the expense of American citizens, and African American and Caribbean descendants of enslaved people who helped make the bronzes by paying for them with their lives. We heirs of the enslaved are still paying for these bronzes with our sufferings due to race discrimination born out of our status as descendants of enslaved people.

What are you and the Inspector General doing to stop this fraudulent transfer? What is the status of your investigation? We need a letter from you verifying that the transfer will be stopped until the actual facts are reviewed. We want co-ownership declared and an agreement drawn up to verify details of the co-ownership relationship. Included should be that we exercise all rights of owner beneficiaries. This would include rights to exhibit and transfer fees and payments; educational, internship, employment and entrepreneurial opportunities associated with the bronzes, etc.

We ask that you stop this transfer and meet with us to work out a co-ownership arrangement. Our children have a right to see the bronzes where they live today due to the enslavement of our ancestors. Transferring them all to Nigeria, to the heirs of the people responsible for our enslavement and genocidal loss of African

***EMERGENCY MOTION***

nationality and homelands, is an act of discrimination and intentional infliction of emotional distress.

Any bronze from the 1500s to 1800s in the Smithsonian collection belongs to descendants of enslaved Africans with DNA from the region called Nigeria -- 93% African Americans, 82% Jamaicans and other Caribbeans identified by DNA research by 23 & Me.[7] These bronzes are clearly identified in your collection.[8] Further, research by metal experts verify the European origin of alloys in the bronzes with manillas from the Portuguese and later European slave traders.[9]

This is an urgent matter that requires urgent action to secure justice. We will be left with no other option but to pursue more aggressive legal action. We prefer to not go that route and settle this amicably as you have attempted with Nigerian stakeholders.

Thank you for your attention.

Sincerely,
Deadria Farmer-Paellmann, J.D., M.A.
Executive Director
Restitution Study Group

(Farmer-Paellmann Decl., ¶ 27). On October 6, 2022, Kevin Grover, Undersecretary for Museums and Culture at the Smithsonian Institution emailed Ms. Farmer-Paellmann in response to her inquiry about what the Smithsonian had decided to do with the Benin bronzes. (Farmer-Paellmann Decl., ¶ 28; at 1-3.). In the email, the Undersecretary stated that in April 2022, the Smithsonian adopted a policy on ethical returns, and pursuant to the process provided under that policy and the National Museum of African Art's collections management policy, it was decided that certain Benin bronzes in the collections of the Smithsonian be deaccessioned. (Farmer-Paellmann Decl., ¶ 28; at 3-6.). The Undersecretary indicated that those deaccessioned items will be returned to the Federal Government of Nigeria, through its National Commission for Museums and Monuments. (Farmer-Paellmann Decl., ¶ 28; at 6-8.) The Undersecretary acknowledged that Ms. Farmer-Paellmann has a different perspective regarding to whom the works should be returned, but emphasized that the Smithsonian has made its decision, and that decision is consistent with their

policy and reflects the best judgment of the museum professionals and others charged with management and stewardship of their collections. (Farmer-Paellmann Decl., ¶ 28; at 8-12).

## III.    LEGAL STANDARD FOR TEMPORARY RESTRAINING ORDER

"The standard for obtaining injunctive relief through either a temporary restraining order or a preliminary injunction is well established." *Gomez v. Kelly*, 237 F. Supp. 3d 13, 14 (D.D.C. 2017). In assessing whether to grant such relief, a court must balance four factors: "(1) whether the movant is substantially likely to succeed on the merits; (2) whether the movant would suffer irreparable injury if the injunction were not granted; (3) whether an injunction would substantially injure other interested parties; and (4) whether the public interest would be furthered by the injunction." *Citizens for Responsibility and Ethics in Washington v. Cheney*, 577 F. Supp. 2d 328, 334 (D.D.C. 2008). "In applying this four-factored standard, district courts employ a sliding scale under which a particularly strong showing in one area can compensate for weakness in another." Id. at 334-35. Accordingly, "the D.C. Circuit has explained: To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision . . . be absolutely certain . . . if the other elements are present . . . it will ordinarily be enough that the plaintiff has raised substantial questions going to the merits." Id. at 335 (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)). For instance, "a court may issue injunctive relief upon 'a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury.'" *Alf v. Donley*, 666 F. Supp. 2d 60, 69 (D.D.C. 2009) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)).

***EMERGENCY MOTION***

## IV.    ARGUMENT

Plaintiffs satisfy all four of the requirements needed to justify a TRO or preliminary injunction in this case. First, Plaintiffs are likely to succeed on the merits. Second, Plaintiffs stand to suffer irreparable harm to their ability to access critical and unique objects that evidence and embody the injustices that led to their ancestors' sales into bondage. Third, Defendant would not be injured by this temporary injunction, as Plaintiffs do not object to the transfer to Nigeria of the portions of the Smithsonian Institution's Benin Bronzes that were created prior to the 1500s, when the slave trade began, or are not made from metals traded in exchange for their ancestors' bondage. Fourth, there is no public interest in the Smithsonian Institution transferring to Nigeria artifacts to which the descendants of the persons sold into slavery in the United States (in exchange for the metals that were melted down to make the artifacts in question) have a superior claim than the descendants of the oppressors who enslaved their ancestors. Accordingly, Plaintiffs respectfully request that this Court enter an order enjoining the Smithsonian Institute from transferring to Nigeria the Benin Bronzes that were fabricated by the Kingdom of Benin when that nation was engaged in the slave trade with European and American slavers.

### A.    Plaintiffs are likely to succeed on the merits

#### (1)    Plaintiffs will satisfy the requirements to show unjust enrichment

Plaintiffs likely satisfy the requirements for a constructive trust under DC law. As the DC Circuit has noted:

> A constructive trust is a purely equitable device which can be applied with great flexibility. It arises by operation of law from the occurrence of an unconscionable act for which no traditional relief is available. A constructive trust can be imposed wherever one unfairly holds title or a property interest and where the holder would be unjustly enriched if permitted to retain such interest.

*Osin v. Johnson*, 243 F.2d 653, 656 (D.C. Cir. 1957) (citing to other cases where the D.C. Circuit had imposed constructive trusts and to the then-current Restatement: *Harrington v. Emmerman*,

***EMERGENCY MOTION***

186 F.2d 757 (D.C. Cir. 1950); *Cahill v. Bryan*,184 F.2d 277 (D.C. Cir. 1950); *Mandley v. Backer*, 121 F.2d 875 (D.C. Cir. 1941); RESTATEMENT, RESTITUTION, § 166 (1937)). Here, Plaintiffs are seeking injunctive relief to prevent the transfer of property to parties who would be unjustly enriched by such a transfer and Defendant should be seen as holding the Benin Bronzes in constructive trust for their benefit.

Courts recognize a constructive trust as a matter of equity where there has been (1) a wrongful act, (2) specific property that can be traced to the wrongful behavior, and (3) unjust enrichment, or a reason why the party holding the property should not be allowed in good conscience to keep it. *See, e.g.*, *Alsco-Harvard Fraud Litigation*, 523 F. Supp. 790, 806-07 (D.D.C. 1981) (citing *Independent Coal & Coke Company v. United States*, 274 U.S. 640 (1926); *Cunningham v. Brown*, 265 U.S. 1 (1924); *St. Louis & San Francisco & Co. v. Spiller*, 274 U.S. 304 (1926); *Reynolds v. Whitin Machine Works*, 167 F.2d 78 (4th Cir. 1945), cert. denied, 334 U.S. 844 (1948)).

The sale of humans into slavery in return for metals that the Kingdom of Benin desired to melt down and use to create the Benin Bronzes in question surely constitutes "a reason why the party holding the property should not be allowed in good conscience to keep it." Here, it should constitute a reason why the property should not be transferred from the Smithsonian Institution to the control of the descendants of the persons who perpetrated the original injustice. Such a transfer would constitute an unjust enrichment.

Unjust enrichment occurs when the moving party has an equitable interest in the property it seeks a constructive trust over. Here, of course, Plaintiffs have an equitable ownership interest in the Benin Bronzes. *E.g.*, RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 40, cmts. a, b & illus. 11, 13, 14, 20.

***EMERGENCY MOTION***

***EMERGENCY MOTION***

Finally, there is likely property that is traceable to the wrongful act—namely the Benin Bronzes themselves the provenance of which has clearly been shown by eminent historians to have originated as payment for enslaved people to the oba and Kingdom of Benin by Portugues, English, and American slavers. The proceeds obtained from their sale can be, and have been, identified. *See*, *e.g.*, RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 40, cmt. e. To be sure, Defendant has claimed to Plaintiff RSG that the involvement of Benin in the slave trade has not been conclusively established. But given Defendant's actions, neither Plaintiff nor this Court need accept Defendant's word at face value, and independent experts may establish and trace the requisite connections between Benin, the slave trade, and the origins of the Benin Bronzes at a trial on the merits. *See, e.g.*, RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT §§ 58–59.

Accordingly, Plaintiffs are likely entitled to a constructive trust covering any of the Benin Bronzes still in Defendant's possession.

> **(2)    Plaintiffs will show that Defendant's transfer of the Benin Bronzes to Nigeria dissipates the corpus of the Smithsonian Institution's trust assets, harms intended beneficiaries, and is *ultra vires* and without statutory authority**

There is no statutory authority for the transfer of the Smithsonian Institution's assets to third parties without consideration. Title 20 of the United States Code provides that "[a]ll laws for the protection of public property in the city of Washington shall apply to, and be in force for, the protection of the ... property of the Smithsonian Institution." 20 U.S.C. § 53. The only provisions in Title 20 not only authorizing but compelling the Smithsonian to repatriate objects is in 20 U.S.C. § 80q–9, which is entitled, "Inventory, identification, and return of Indian human remains and Indian funerary objects in possession of Smithsonian Institution." Under 20 U.S. Code § 80q–9a(b), the Smithsonian Institution is statutorily obligated to repatriate

***EMERGENCY MOTION***

"expeditiously" to Native Americans certain objects of "cultural patrimony" upon the requisite showing of "cultural affiliation" based on geographical, kinship, biological, archaeological, anthropological, linguistic, folkloric, oral traditional, historical, or other relevant information or expert opinion. No such authority exists for other assets of the Smithsonian Institution.

Under sub-chapter XII of Title 20, which concerns the National Museum of African Art and is entitled, "Donation and transfer of lands and improvements, works of art, and other assets and property of Museum of African Art to Smithsonian Institution," Section 80m(a)(4) states that the Board of Regents,

> [f]or the purpose of carrying out sections 80k and 80l of this title ... may—
>
> (4) subject to any limitations otherwise expressly provided by law, and, in the case of any gift, subject to any applicable restrictions under the terms of such gift, *sell, exchange, or otherwise dispose of any property of whatsoever nature acquired pursuant to the provisions of this subchapter*: Provided, That *the proceeds from the sale of any property acquired pursuant to section 80k of this title shall be designated for the benefit of the Museum*.

(emphasis added). As written, this provision means that the Board of Regents' transfer of valuable "art objects" in the collection of the National Museum of African Art can only be disposed of by sale or exchange in which the value received remains with the Museum. Unlike § 80q–9a(b), this provision makes no reference to "repatriation" of property to its "original owners" or source. As this provision relates to the Benin Bronzes, the "gifting" of some tens of millions in art objects in exchange for $0 not only reduces the numbers of art objects but the net value of the collection. Moreover, the Benin Bronzes are, for the reasons discussed, cultural objects that have great cultural significance to the generations of African-Americans whose ancestors' lives paid for them.

***EMERGENCY MOTION***

**B.      Plaintiffs stand to suffer irreparable injury in the absence of relief**

In the absence of an order prohibiting Defendant from transferring Benin Bronzes to Nigeria, Plaintiffs will suffer irreparable harm through the loss of access to these objects. "To be irreparable, an injury must be 'certain and great,' 'actual and not theoretical,' and 'of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Fraternal Order of Police Library of Cong. Labor Comm. v. Library of Cong.*, 639 F. Supp. 2d 20, 24 (D.D.C. 2009) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). Additionally, "[t]he injury also must be 'beyond remediation,' meaning: Mere injuries . . . are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Fraternal Order of Police Library of Cong. Labor Comm.*, 639 F. Supp. 2d at 24 (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297-98). The injuries Plaintiffs stand to suffer if the Smithsonian Institution transfers the Benin Bronzes to Nigeria are imminent, as Defendant plans to effectuate the transfer in less than one week, on October 11, 2022. As demonstrated below, the magnitude of the injuries that will inure to Plaintiffs in the absence of relief are significant and cannot be addressed by any alternative relief. Once the transfer takes place, the Benin Bronzes will be moved beyond the jurisdiction of this Court; if relief is not granted now, there is no remedy this Court can fashion that would restore the artifacts to the possession of the Smithsonian Institution or any other museum or institution in the United States, where Plaintiffs are located.

This transfer is imminent and certain and will occur in the absence of relief from this Court. Thus, the harm that Plaintiffs will suffer is not theoretical. As set forth in the attached Declaration of Deadria Farmer-Paellmann, Ex. A, transfer of the Benin Bronzes will directly and

***EMERGENCY MOTION***

substantially harm the ability of descendants of the victims of the slave trade emanating from the Kingdom of Benin to access artifacts that evidence their ancestors' enslavement and thus the transfer stands to work serious harm against Plaintiffs' interests. Further, the artifacts that Defendant has decides to transfer constitute the proceeds of an unjust and inhumane transaction for the transfer of human beings into bondage. Such proceeds belong, if anywhere, with the descendants of those for whom the artifacts were traded rather than with the descendants of those whom the original transaction unjustly enriched.

These harms are sufficient to warrant a TRO or preliminary injunction. Once the transfer at issue is made in this case, the harm is irreparable. No amount of financial compensation can undo the harm that would necessarily result if the Smithsonian Institution is permitted to make the transfer that it intends to make here. Therefore, a TRO or preliminary injunction is necessary to prevent these irreparable injuries from coming to pass before the Court has had the opportunity to weigh the merits of this case.

    **C.**    **The Smithsonian Institution would not be harmed by a Temporary Restraining Order or Preliminary Injunction**

Preventing the Smithsonian Institution from transferring the Benin Bronzes to the NCMM and the descendants of the original slave traffickers in Nigeria could not harm the Defendant or its mission. Plaintiffs do not oppose the transfer of Benin Bronzes or other artifacts that clearly do not constitute and are not linked to proceeds of the slave trade. Any harm to the Smithsonian Institution or its mission by delaying the transfer of these items would be marginal at worst.

***EMERGENCY MOTION***

***EMERGENCY MOTION***

**D.      Delay to allow for consideration of the critical interests at issue would be in the public interest**

The public can have no interest in the immediate transfer of the Benin Bronzes to the descendants of the slave traffickers who originally received the metal that was used to create the artifacts. The public's interest in the transfer is insubstantial.

By contrast, there is a strong public interest in the Smithsonian Institution's fulfillment of its mission in "the increase and diffusion of knowledge." Smithsonian Institution, Purpose and Vision, https://www.si.edu/about/mission. This mission, established in the original last will and testament of James Smithson, of London, UK, and recorded in the Act establishing the Smithsonian Institution and its governance structure, specified that the Smithsonian Institution would collect (among many other things) "objects of art" and "facilitate the examination and study of them." 9 Stat. 102 (Aug. 10, 1846) preamble, § 6, codified at 20 U.S.C. § 50.

Increasing the diffusion of knowledge and study of the Benin Bronzes and the role they played in the slave trade is part of the Smithsonian Institution's core mission and in the public interest. This interest would be thwarted by transferring the artifacts to Nigeria and losing the ability to educate Plaintiffs and their children and descendants about this critical piece of their cultural history and that of the United States.

Accordingly, there is a strong public interest in ensuring that Defendant does not transfer the Benin Bronzes and works with Plaintiffs to effectuate programs to study and preserve the artifacts' roles in bringing Plaintiffs' ancestors to this country as enslaved people. In the absence of an order prohibiting the transfer of the bronzes, the transfer will happen and public interest harmed.

Accordingly, all four of the prongs of the test governing whether a TRO or a preliminary injunction should issue demonstrate that such relief is appropriate in this case.

***EMERGENCY MOTION***

**\*\*\*EMERGENCY MOTION\*\*\***

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant their motion and enter a restraining order temporarily prohibiting removal of the Benin bronzes from the Smithsonian Institution and the United States until such time as the claims in this lawsuit have been adjudicated.

Dated: October 7, 2022

/s/ *Adriaen M. Morse Jr.*
Adriaen M. Morse Jr. (DC Bar No. 483347)
Cory Kirchert (D.C. Bar No. Pending)
Lionel André (D.C. Bar No. 422534)
SECIL LAW PLLC
1701 Pennsylvania Avenue, NW, Suite 200
Washington, D.C. 20006
Tel:  202.417.8232
amorse@secillaw.com

*Counsel for Plaintiffs*