IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEADRIA FARMER-PAELLMANN and RESTITUTION STUDY GROUP, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SMITHSONIAN INSTITUTION,<br><br>Defendant. | **EMERGENCY MOTION**<br><br><br>Civil Action No. 1:22-cv-3048<br>ORAL ARGUMENT REQUESTED |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR EMERGENCY TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Plaintiffs, by and through counsel, submit the following in reply to Defendant's opposition memorandum and in opposition to its Motion to Dismiss:

**I.    INTRODUCTION**

Plaintiffs have timely filed this case and they have clear standing to sue. Defendant's claim that this case should be dismissed for failure to state a claim fails as a matter of law. Defendant can point to no authority under its trust charter or any enabling statute for the action it has taken in gratuitously transferring title to objects held in trust for the United States to a third party which is not a trust beneficiary. Plaintiffs' Complaint notes the *ultra vires* nature of Defendant's action and states claims for unjust enrichment and violation of a federal statute. Their motion should be granted and Defendant's motion to dismiss denied.

***EMERGENCY MOTION***
1

II.    **ARGUMENT**

    A.    **This Case Was Timely Filed**

In Defendant's customary posture of seeking to hold itself unaccountable for any of its decisions or actions, the Smithsonian Institution claims that this case has been filed too late because its Board of Regents decided to transfer the Benin Bronzes on June 13, 2022. Undoubtedly, had Plaintiffs filed this case on June 14, Defendant would have claimed that the filing was premature, since (as documented in the Declaration of Deadria Farmer-Paellman, attached to the Motion ("Dec.")), the Smithsonian Institution's Director of the National Museum of African Art, Ms. Blankenberg, was discussing with Plaintiff Farmer-Paellman potential ways in which Plaintiffs might have a say in Defendant's choices around the Benin Bronzes. Or Defendant would have claimed that an action filed on June 14 was itself too delayed, since Plaintiffs had been aware of Defendant's intentions with regard to the Benin Bronzes since late 2021 when the Smithsonian Institution first noted that it was deaccessioning (removing from display) the works and discussing a return with Nigeria. The fact remains that it was not until October 6 that Defendant communicated what the Smithsonian Institution itself called "its decision" to Plaintiffs. The argument that the filing is too late or untimely is without merit.

    B.    **Plaintiffs Have Standing to Sue in This Matter**

Plaintiffs have standing to sue the Smithsonian Institution in this matter. To establish standing, a party must establish three elements: (1) an injury in fact that is "concrete and particularized" and that is "actual or imminent" as opposed to "conjectural or hypothetical"; (2) the injury must be "fairly traceable" to the conduct that is the subject of the lawsuit; and (3) a decision in plaintiff's favor must be likely to provide an adequate remedy. *Star Scientific Inc. v. Beales*, 278 F.3d 339, 358 (4th Cir. 2002).

In the absence of an order prohibiting Defendant from transferring Benin Bronzes to Nigeria, Plaintiffs will suffer irreparable harm through the loss of access to these objects. Arguably, the Smithsonian Institution could be sued by any United States citizen because it acts as a trustee of the nation's cultural and historical artifacts on behalf of all Americans. Here, however, the injury caused by the Smithsonian Institution's transfer of the Benin Bronzes to Nigeria is different for Plaintiffs because they belong to the class of Americans whose history and culture is most uniquely entwined with the Benin Bronzes. As set forth in the Farmer-Paellmann Declaration, Dec. ¶¶ 2-3, Plaintiffs' ancestors were sold by the Kingdom of Benin during the Transatlantic slave trade in exchange for manillas that were melted down by the Benin monarchy and used in the fabrication of the Benin Bronzes. Plaintiffs constitute an identifiable class of people whose injury is concrete, particularized, and unique to them. Their injury as a result of Defendant's actions is imminent and not theoretical. Defendant signed an agreement with Nigeria on October 11, 2022 to effectuate the transfer in less than one week, on October 17, 2022. This agreement was signed four days after the Smithsonian Institution was notified of the existence of this lawsuit and provided copies of the Complaint, Summons, and Motion papers. Once the transfer takes place, the Benin Bronzes will be moved beyond the jurisdiction of this Court. If relief is not granted now, there is no remedy this Court can fashion that would restore the artifacts to the possession of the Smithsonian Institution or any other museum or institution in the United States, where Plaintiffs are located. While Defendant claims that no "irreparable harm" will take place if the transfer of the Benin Bronzes goes through, the fact remains that the museum where they are to be displayed does not yet exist, Nigeria's history of dealing with its own cultural artifacts (including the Benin Bronzes, where a former head of state took one of

them out of Nigeria's national museum and re-gifted it to the Queen of England)[1] has been fraught. Furthermore, the fact that the Oba and royal family of Benin currently (and correctly) believe these objects to be their personal property, and the Smithsonian Institution's own lack of standing to enforce any agreement or condition of care that it might have included in its agreement with Nigeria, all indicate that a transfer will be irrevocable and constitute irreparable harm.

The injuries Plaintiffs stand to suffer is directly due to the conduct by the Defendant—namely, deciding to transfer title to 29 Benin Bronzes to Nigeria without consulting Plaintiffs, whose ancestors' freedom, health, and very lives were exchanged for the metal that went into constructing the Benin Bronzes.

A decision in favor of the Plaintiffs, as requested in the Complaint and the Motion, will provide an "adequate remedy" to address Plaintiffs' issues. Specifically, Plaintiffs seek to enjoin the transfer of ownership to Nigeria and to require the Smithsonian Institution to consult with Plaintiffs about how to address the complete history of these artifacts, their role in the slave trade, and to create programs in consultation with Plaintiffs that will allow this history to be communicated and understood by this and future generations of descendants of enslaved people. Accordingly, Plaintiffs have standing to sue the Smithsonian Institution in this matter.

---

[1] *See, e.g.*, David Frum, *Who Benefits When Western Museums Return Looted Art?*, THE ATLANTIC (Sep. 14, 2022), https://www.theatlantic.com/magazine/archive/2022/10/benin-bronzes-nigeria-return-stolen-art/671245/ (note that this example is from 1973, almost fifty years ago, and under a different government but, as the article notes, even today there is an ongoing struggle between Nigeria's federal government and Nigerian states such as Edo (which encompasses the former Kingdom of Benin) about control over valuable cultural artifacts).

### C. The Smithsonian Institution is a Government Corporation Chartered to Operate as a Trust with Limited Powers

A short perusal of the relevant cases yields the not-so-surprising insight that the Smithsonian Institution consistently claims for itself any and all benefits accorded to federal government agencies, all the while disclaiming any of the inherent limitations that serve to keep federal agencies accountable for their actions and decisions. This is truly a case of "having your cake and eating it too," and Defendant's posture in the present matter is in line with this historical approach. Such consistency, however, does not mean that the approach merits endorsement in this case, as explained in greater detail below.

#### 1. The Smithsonian Institution is a Government Corporation Created to Function as a Trust that Holds Assets of the United States

The Congress and President incorporated the Smithsonian Institution in 1846 by private act.[2] An Act to Establish the Smithsonian Institution, for the Increase and Diffusion of knowledge Among Men, 9 Stat. 102 (Aug. 10, 1846) ("Act of Establishment"). As such, the Smithsonian Institution is a "government corporation." In terms of creation, corporations are fictional bodies that governments create, either by a specifically enacted "establishment statute" or by general enabling statute. The term "government corporation" in Title 5 implicitly refers to a corporation that the United States government created.

---

[2] A "private act" is one in which a legislature enacts a law that affects or is for the benefit of a specific person or group. Until the late 1800s, corporations in the United States were formed by private acts because states and the federal government lacked a general enabling statute for forming corporations. *See, e.g.*, Tyler Halloran, *A Brief History of the Corporate Form and Why it Matters*, FORDHAM J. OF CORP. & FIN. LAW (Nov. 18, 2018), https://news.law.fordham.edu/jcfl/2018/11/18/a-brief-history-of-the-corporate-form-and-why-it-matters/.

The Act of Establishment provided that officers of the United States government, originally including both the President and Vice President, were thereby "constituted, an 'establishment' by the name of the 'Smithsonian Institution,' and ... by that name shall be known and have perpetual succession as to the powers, limitations, and restrictions, hereinafter contained, ***and no other***." *Id.* § 1 (emphasis added). As has previously been noted, the Smithsonian Institution was conceived as a trust instrumentality of the United States. *O'Rourke v. Smithsonian Institution Press and the Smithsonian Institution*, 399 F.3d 113, 114 (2d Cir. 2005) (citing to a declaration filed by the Smithsonian Institution's general counsel). Accordingly, Congress conferred upon Defendant specific, limited powers as a corporation and as a trust.

The core function of the Smithsonian Institution, through the decision-making of its Board of Regents, is to receive, maintain, and hold the assets of the trust, and not to dissipate such assets. In addition to the explicit language in the Act of Establishment, the basic structure of the Smithsonian Institution reveals it to be a trust. A trust exists when a settlor exhibits an intent to create a trust, with a trust charter organizing the trust, providing authority to the trustee, delineating the powers and limitations on the trustee's authority, designating the corpus of the trust, and defining its beneficiaries. *See, e.g., Begier v. I.R.S.*, 496 U.S. 53, 62 (1990); *He Depu v. Yahoo! Inc.*, 950 F.3d 897, 901-02 (D.C. Cir. 2020). Congress, as settlor, intended to create the Smithsonian Institution as a trust, and its charter is found in the Act of Establishment, as it has been amended since enactment. *See* 20 U.S.C. § 41.

Defendant's self-perception differs from its charter. "The Smithsonian perceives itself ... [as] a charitable trust for the benefit of humankind whose trustee is the United States." Letter for Douglas W. Kmiec, Deputy Assistant Attorney General, Office of Legal Counsel, from Peter G.

Powers, General Counsel, Smithsonian Institution at 1 (Apr. 10, 1987) (quoting 20 U.S.C. § 41) ("Powers Letter"). This contradicts the very language of the Act of Establishment. That document stated that James Smithson, of London, had:

> by his last will and testament given the whole of his property to the United States of America, to found at Washington, DC, under the name of the "Smithsonian Institution," an establishment for the increase and diffusion of knowledge among men and the United States having, by an act of Congress, received said property and accepted said trust; therefore, for the faithful execution of said trust, according to the will of the liberal and enlightened donor—

Congress enacted the Act of Establishment. Act of Establishment, § 1. Smithson clearly "gave" all of his property to the United States which then, via Congress as settlor, placed the trust property into a trustee's care. The Smithsonian Institution and its Board of Regents, not the United States, act as trustee. The trust's purpose, to increase and diffuse knowledge among men, does not empower the trustee to dissipate trust assets, which remain the property of the United States. While humankind might broadly benefit from the Smithsonian Institution's mission to increase and diffuse knowledge, when focusing on the corpus of the trust, *title* to these assets is held for the benefit of the people of the United States, not all of humankind. The assets might be loaned out for display to other museums, including museums in other countries, but simply transferring title to the assets of the trust, gratuitously and without consideration, is beyond any authority conferred by the Act of Establishment.

    **2.    The Congressionally Delegated Powers of the Smithsonian Institution as a Corporation and the Board of Regents as Governors are Enumerated in the Act of Establishment**

The legislative and executive branches established the Smithsonian Institution as a public corporation by private act: the artificial "corporation" or "body" called the Smithsonian Institution exists by government fiat subject to authorized powers and limitations. Specifically, to administer the trust, the Government *delegated governmental authority* to the Smithsonian

Institution:

- To hold legal title to the assets of the corpus in its name;

- To respect and honor the equitable title to the assets of the corpus of the beneficiary, the United States, and the beneficiaries, the citizens of the United States;

- To transact relative to the trust corpus:

    – *To maintain* or *to increase* the value of the trust assets and overall corpus in terms of monetary value, market value, and cultural, historical, or art value;

    – To earn interest on its monetary assets[3] (9 Stat. 102).;

    – To accept and receive donations of assets on behalf of the trust, including—

        - "The government has chosen to support the trust with substantial appropriations and Federal property, largely in response to major benefactions and collections from the private sector." Powers Letter at 5.

        - To purchase assets on behalf of the trust; and

        - To exchange or sell assets on behalf of the trust for equal or increased consideration.

*See, generally*, Act of Establishment.

### 3. The Smithsonian Institution and the Board of Regents Lack Corporate or Trust Authority to Dispose of Trust Assets Gratuitously

Defendant and its Board of Regents have been granted specific statutory powers by Congress concerning the core functions of operating the trust. The power to dispose of trust assets is circumscribed. Specifically with respect to the National Museum of African Art

---

[3] From the beginning of its existence, Congress sought to increase the value of the corpus by ensuring that the Smithsonian Institution earned interest on the bequest of James Smithson. 9 Stat. 102, § 2.

("Museum"), Defendant is permitted to "purchase, accept, borrow, or otherwise acquire additional works of art or any other real or personal property for the Museum," "preserve, maintain, restore, display, loan, transfer, store, or otherwise hold any property of whatsoever nature acquired pursuant to section 80k of this title,"[4] and "subject to any limitations otherwise expressly provided by law, and, in the case of any gift, subject to any applicable restrictions under the terms of such gift, sell, exchange, or ***otherwise dispose*** of any property of whatsoever nature acquired pursuant to the provisions of this subchapter: ***Provided***, That the proceeds from the sale of any property acquired pursuant to section 80k of this title shall be designated for the ***benefit of the Museum***." 20 U.S.C. § 80m(a) (emphasis added). At least with respect to this museum, Defendant's powers over the disposition of the museum's collection are circumscribed.

In the context of Defendant's authority as a governmental corporation and a trust, the statutory grant of authority to dispose of any of the Museum's assets does not extend to gratuitously transferring trust assets without any benefit to the Museum. Any such purported transfer lies beyond the authority granted to Defendant. Unless the statute is interpreted to prevent gifting of items in the museum's collection, then there is nothing to prevent Defendant from gifting the entire collection, not only of the Benin Bronzes, but any or all other components of the collection.[5] If the statute is interpreted in this manner, then the conclusion must be that Congress intended that this be a possibility.

---

[4] The privately-held Museum of African Art's assets and collection were donated to the Smithsonian Institution, which used the donated assets to found its National Museum of African Art. Section 80k authorized the Smithsonian Institution's Board of Regents "to accept a deed or other instrument donating and transferring to the Smithsonian Institution, the land and improvements thereto, collections of works of art, and all other assets and property of the Museum of African Art." 20 U.S.C. § 80k.

[5] This, in fact, seems to be the actual position of the museum's director, Ms. Blankenberg, who told a reporter, "if our whole museum is based on stolen objects, then frankly we shouldn't exist." Kelsey Ables, *Smithsonian gives back 29 Benin bronzes to Nigeria: 'We are not owners,'*

### 4. The Smithsonian Institution Lacks Delegated Authority to Issue Rules

The Smithsonian Institution is not a legislative entity to which Congress delegated specific rule-making powers concerning its core functions. Congress has not granted Defendant delegated authority to reduce the value of the trust by gifting assets of the United States. In the Administrative Procedures Act ("APA"), Congress has granted executive agencies authority to make rules concerning their core functions, typically administering specific federal laws.

Defendant has repeatedly asserted that the APA does not apply to it and has made the same assertion with respect to other laws that bind executive agencies, including the Privacy Act[6] and the Freedom of Information Act.[7] At the same time, Defendant asserts that it is a federal government entity for purposes of enjoying certain benefits and rights enjoyed by other federal government entities, such as funding by U.S. taxpayers, immunity from state laws as a federal government entity,[8] employee immunity from lawsuits for alleged misconduct under federal laws,[9] and benefits under the Federal Property and Administrative Services Act.[10]

---

WASH. POST, Oct. 11, 2022, https://www.washingtonpost.com/arts-entertainment/2022/10/11/smithsonian-benin-bronzes-nigeria/.

[6] *See, e.g.*, *Dong v. Smithsonian Inst.*, 125 F.3d 877, 879 (D.C. Cir. 1997) (holding that the Smithsonian Institution is not an executive agency because it is neither a controlled government corporation or independent establishment and because it lacks "governmental authority"); *Dodge v. Trustees of the National Gallery of Art*, 326 F. Supp. 2d 1, 11 (D.D.C. 2004) (same).

[7] *See, e.g.*, *Cotton v. Heyman*, 63 F.3d 1115 (D.C. Cir. 1995).

[8] Memorandum Opinion for the Assistant General Counsel Smithsonian Institution, *Immunity of Smithsonian Institution from State Insurance Laws*, at __ (Apr. 25, 1997) (Exhibit __).

[9] See, e.g., *Expeditions Unlimited Aquatic Enter., Inc. v. Smithsonian Institution,* 566 F.2d 289, 291 (D.C. Cir. 1977); *Genson v. Ripley*, 681 F.2d 1240 (9th Cir.), cert, denied, 459 U.S. 937 (1982).

[10] *See*, Memorandum Opinion for the General Counsel of the General Services Administration, *The Status of the Smithsonian Institution Under the Federal Property and Administrative Services Act,* at 122 (June 30, 1988).

This pick-and-choose model for deciding when a beneficial federal law applies, and a non-beneficial law does not apply, to the Smithsonian Institution relies on the obvious fiction that Congress had a "separate intent" about any given federal statute enacted after 1846 as applied to the Smithsonian Institution. Relying on this assumption, the test *for each federal statute* is: (1) Did Congress "intend the applicable federal act to apply to the Smithsonian at all" and (2) Did Congress intend that the Smithsonian be treated as an "executive agency" or "federal agency" under the applicable federal act.[11]

The Act of Establishment fails to provide any authority to engage in rulemaking. Since Defendant claims not to be a federal executive agency under the APA, it is not entitled to engage in rulemaking.

Defendant has, nevertheless, created a rule absent any delegated or statutory authority. Specifically, on April 29, 2022, the Smithsonian Institution created the "Shared Stewardship and Ethical Return Policy."[12] This "ethical policy" is a rule authorizing the gratuitous disposal of trust assets in violation of its limited powers under the trust charter. The Board of Regents, in enacting its resolution to transfer the Benin Bronzes on June 13, 2022, relied on this policy. Because the policy was enacted without authority, decisions based upon the policy are *ultra vires* and should be voided.

Moreover, if the Smithsonian Institution wishes to argue that, for the purposes of this application of the APA it is a federal executive agency under that Act, Defendant failed to comply with the APA's requirements, including public notice and comment.

---

[11] *Id*. at 123-24.

[12] Smithsonian Institution, Shared Stewardship and Ethical Returns Policy (Apr. 29, 2022), chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://ncp.si.edu/sites/default/files/files/Ethical%20Return%20Docs/shared-stewardship-ethical-returns-policy_4.29.2022.pdf

## III.  CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant their motion and enter a restraining order temporarily prohibiting removal of the Benin bronzes from the Smithsonian Institution and the United States until such time as the claims in this lawsuit have been adjudicated and also to deny Defendant's Motion to Dismiss.

Dated: October 14, 2022                     /s/ *Adriaen M. Morse Jr.*
                                            Adriaen M. Morse Jr. (DC Bar No. 483347)
                                            Cory Kirchert (D.C. Bar No. Pending)
                                            Lionel André (D.C. Bar No. 422534)
                                            SECIL LAW PLLC
                                            1701 Pennsylvania Avenue, NW, Suite 200
                                            Washington, D.C. 20006
                                            Tel:  202.417.8232
                                            amorse@secillaw.com

                                            *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2022, I filed a copy of the foregoing Reply Memorandum in Support of Plaintiff's Motion for Emergency Temporary Restraining Order and Preliminary Injunction and in Opposition to Defendant's Motion to Dismiss with the Court via ECF, which operates to effect service on counsel for all parties who have entered an appearance.

                                                  /s/ *Adriaen M. Morse Jr.*
                                                  Adriaen M. Morse Jr.